Present:  All the Justices

FIDELINA D. ACUAR

v. Record No. 992228  OPINION BY JUSTICE CYNTHIA D. KINSER
                                          June 9, 2000
KEVIN LETOURNEAU

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
H. Thomas Padrick, Jr., Judge


This appeal arises out of a motor vehicle accident that occurred in December 1995 in the City of Virginia Beach.  Kevin Letourneau filed a motion for judgment against Fidelina D. Acuar seeking damages for injuries he allegedly sustained as a result of that accident.  Acuar admitted liability, and the case proceeded to trial solely on the issue of damages.  A jury returned a verdict in favor of Letourneau and awarded him damages in the amount of $150,000.  The circuit court entered judgment in accordance with the jury verdict.

We awarded Acuar this appeal on two assignments of error: (1) that the circuit court erred in allowing repeated references to a police accident report in violation of Code § 46.2-379, and (2) that the circuit court erred in allowing those portions of Letourneau's medical expenses that were "written off" by his health care providers to be submitted to the jury.  Because we conclude that the court erred in permitting numerous references to

the accident report, we will reverse the circuit court's judgment and remand for a new trial. Furthermore, since the second issue will arise again during a new trial on remand, we also decide that issue and conclude Letourneau may present evidence at the new trial of the full amount of his reasonable medical expenses without any reduction for the amounts "written off" by his health care providers.

FACTS

The facts pertinent to these issues are not in dispute. On the morning of trial, Acuar made a motion to exclude the amounts of Letourneau's medical bills that were "written off"[1] by his health care providers.[2] Although the court expressed the view that those portions written off should not be introduced into evidence, the court denied Acuar's motion on the basis that it was in the nature of a

---

[1] Pursuant to agreements between health care providers and health insurance carriers, health care providers routinely deduct certain amounts from the total costs of medical treatment. Those are the amounts "written off."

[2] Letourneau's medical bills were in excess of $41,000. However, after deducting the amounts written off by the health care providers, his medical bills totaled $13,618.51. Letourneau introduced bills totaling $40,831.03 into evidence during the trial. Acuar admitted the reasonableness and authenticity of Letourneau's medical bills.

2

motion in limine and that, as such, it was not timely made under the court's scheduling order.[3]

During the trial, Albert L. Mills, the police officer who investigated the motor vehicle accident in question, testified. During direct examination, counsel for Letourneau asked Mills if he needed to refresh his memory with regard to the type of one of the vehicles involved in the accident. In response, Mills stated, "Yes. I don't have a copy of the accident report." At that point, while handing the accident report to Mills, Letourneau's counsel advised the court that Mills "may need to refer to this. This is his accident report."

Acuar's counsel then requested a bench conference, after which the following colloquy took place:

BY [LETOURNEAU'S COUNSEL]:

Q    Officer Mills, does what I just handed you refresh your recollection?

A    Yes, sir. That's a copy of the accident report which I filled out during that time frame.

Q    Okay.

[ACUAR'S COUNSEL]:  I've objected.

---

[3] The circuit court had previously entered a scheduling order that provided, in pertinent part, that "[m]otions in limine shall be scheduled for hearing **before** the trial date."

3

THE COURT: Officer, just look directly at the report and respond to the question.

Acuar then objected to the manner in which the document was being utilized to refresh the officer's memory. The trial court overruled the objection on the basis that the document was only being used to refresh Mills' recollection.

Later in the direct examination of Mills, Letourneau's counsel asked the officer to mark on a photograph the location of Letourneau's vehicle at the accident scene. In response Mills stated, "I don't particularly remember exactly where the vehicle was in that intersection. All I can do is recollect what the diagram shows on my accident report." Mills' reference to his accident report again drew an objection from Acuar's counsel.

On re-direct, Letourneau's counsel asked Mills, "Officer, when you testified that the — how the truck ended up, was that going by your memory?" Mills answered in the affirmative, and counsel then asked, "Look at your diagram again and tell me whether or not —." Acuar's counsel objected again and stated that the problem of referring to the accident report was being compounded. The court then directed the officer to check his notes and refresh his recollection.

4

Acuar's counsel also objected when a diagram was mentioned in the following colloquy between Letourneau's counsel and Mills:

> Q    Did you look at the skid marks in the street?
>
> A    I did look at the scene. I don't have anything indicated about skid marks, although the diagram I have indicated that —
>
> [ACUAR'S COUNSEL]:  Judge, there's where I have an objection as to —
>
> THE COURT:  Do you have any independent recollection or in looking at your notes to indicate if at any time any vehicle spun?
>
> THE WITNESS:  Yes, sir, the diagram that I have drawn based on the accident scene during that time frame shows that the vehicle did turn slightly after impact.

At a recess during trial, Acuar's counsel argued that "the words 'accident report' are not supposed to be used in front of the jury," and moved for a mistrial because of the numerous references to the report. The circuit court denied the motion, although it indicated that it might give the jury a cautionary instruction.

On the second day of the trial after reviewing relevant cases, the court acknowledged that Acuar's objections to the use of the term "accident report" should have been sustained, but the court had not yet decided what action to take with regard to the admission of that

testimony.  On the third and final day of trial, the court announced that it was not going to change its earlier ruling with respect to the references to the accident report, and was allowing the testimony to remain in evidence.  The court also declined to give a curative instruction, believing that "it [would] create more problems than it would resolve."

Since Acuar admitted liability, Mills' testimony focused on the force of the impact between the two vehicles and their relative positions after the collision occurred. Donald Stanley, a deputy sheriff with the City of Virginia Beach Sheriff's Office, also testified with regard to the same issues, without referring to the accident report. Stanley was driving to work, travelling directly behind Letourneau's truck at the time of the collision.  Stanley witnessed the accident and saw Acuar's vehicle collide broadside with Letourneau's truck, causing the truck to spin around 180 degrees, go up and over the curb, and knock down a tree in the median.  Letourneau also introduced into evidence photographs depicting the damage to both parties' vehicles.

ANALYSIS

I. ACCIDENT REPORT

6

On the first issue, Acuar argues that the circuit court violated Code § 46.2-379 by allowing the jury to hear repeated references to Mills' accident report. Acuar also posits that the court's direction to the officer to refer to his report to refresh his recollection increased the likelihood that the jury placed undue weight on its contents even though the report was not actually admitted into evidence.

In response, Letourneau points out that the first mention of the accident report occurred when Mills stated, without solicitation, that he did not "have a copy of the accident report." Continuing, Letourneau stresses the fact that the only time that his counsel used the phrase "accident report" was when he handed the report to Mills so the officer could use it to refresh his recollection.

Letourneau also contends that Mills' references to the accident report and its contents were merely cumulative of Stanley's testimony and the photos of the vehicles, both of which conclusively established the force of the impact between the two vehicles. Also, Mills did not testify about any facts or circumstances that were disputed. Thus, argues Letourneau, any error by the circuit court on this issue was harmless. We do not agree.

7

Code § 46.2-379 provides, in pertinent part, that "accident reports made by investigating officers . . . shall not be used as evidence in any trial, civil or criminal, arising out of any accident."  As we have previously stated, "[t]he rationale of the statute is that the report, although routinely and sometimes hurriedly made, . . . nevertheless carries with it the stamp of a written and official document to which a jury could attach more weight than it is properly due."  Davis v. Colgin, 219 Va. 5, 7, 244 S.E.2d 750, 751 (1978).  Accord Cherry v. D.S. Nash Constr. Co., 252 Va. 241, 246, 475 S.E.2d 794, 797 (1996); Galbraith v. Fleming, 245 Va. 173, 175, 427 S.E.2d 187, 188 (1993).

In Phillips v. Schools, 211 Va. 19, 175 S.E.2d 279 (1970), the plaintiff's attorney sought to cross-examine the defendant about a prior statement by making specific reference to an accident report.  Although the plaintiff conceded that the report itself could not have been introduced into evidence if the defendant denied making the statement, the plaintiff nevertheless asserted that he should be permitted to use the report to cross-examine the defendant about a statement in the report.  However, this Court held that "to have permitted plaintiff's counsel to make specific reference to the report in the presence of

8

the jury, and to read defendant's statement therein for the purpose of contradicting him, would have in effect accomplished indirectly what [former] Code § 46.1-407[4] forbids to be done directly." Id. at 22-23, 175 S.E.2d at 281.

Similarly in Davis, the plaintiff's counsel furnished the investigating police officer with a copy of the officer's accident report for the purpose of refreshing the officer's memory. The officer was then questioned about the details of the accident. On cross-examination, the defendant's counsel attempted to ascertain how the officer had refreshed his recollection regarding the accident and asked the officer about the accident report. Davis, 219 Va. at 6, 244 S.E.2d at 750-51. Even though the report was not introduced into evidence, this Court held that "no reference" should have been made to the report by either party or their counsel. Id. at 8, 244 S.E.2d at 751.

As in Davis and Phillips, the accident report was not introduced into evidence in the present case. However, the

---

[4] Former Code § 46.1-407 provided that accident reports were to be confidential, while former Code §§ 46.1-408 and -409, inter alia, barred the use of accident reports as evidence in any trial. Those portions of former Code §§ 46.1-408 and -409 are now codified at Code § 46.2-379.

numerous references to it[5] during Mills' testimony by not only the officer but also the court and Letourneau's attorney amounted to nothing less than an official stamp being placed on the document used to refresh Mills' recollection.  Thus, the jury could have placed more weight on Mills' testimony than it might otherwise have done.  As we said in Phillips, the references to the accident report "accomplished indirectly what Code § [46.2-379] forbids to be done directly."  211 Va. at 22-23, 175 S.E.2d at 281. Therefore, we conclude that the circuit court erred in allowing the repeated references to the accident report.

We also do not believe that the error was harmless. Since Acuar admitted liability, the only issue for the jury to determine was the quantum of damages.  Evidence of the details of the collision and the severity of the impact between the two vehicles was material and relevant to an assessment of the trauma and injury that Letourneau sustained.  See Wallen v. Allen, 231 Va. 289, 293-94, 343 S.E.2d 73, 76 (1986).  Since Stanley's testimony followed, and was in most respects cumulative of, Mills' testimony, the repeated interjection of the accident report in front of the jury made it more difficult for Acuar's counsel to

---

[5] The accident report was also referred to by the terms "diagram" and "report."

10

effectively test Stanley's memory during cross-examination. In other words, the "stamp of a written and official document," Davis, 219 Va. at 7, 244 S.E.2d at 751, that implicitly accompanies an accident report enhanced not only Mills' testimony but also that of Stanley. Therefore, we cannot say that the numerous references to the accident report were not prejudicial to Acuar. Accordingly, we will remand this case to the circuit court for a new trial.

## II. MEDICAL EXPENSES WRITTEN OFF

We now address the question whether those portions of Letourneau's medical bills that his health care providers wrote off can be submitted to the jury. We decide this issue because it will likely arise again in a new trial.[6] See Shelby Ins. Co. v. Kozak, 255 Va. 411, 416, 497 S.E.2d 864, 868 (1998).

We begin with a discussion of the collateral source rule, the applicability of which is central to this issue. The collateral source rule is a long-standing principle in Virginia tort law and has been applied in tort cases for

---

[6] We will not address the question whether the circuit court abused its discretion in ruling that Acuar's motion to exclude the portions of the medical bills written off was not timely under the court's scheduling order. In light of our determination that this case will be remanded for a new trial, that question is moot.

11

more than a century.[7]  See Schickling v. Aspinall, 235 Va.
472, 475, 369 S.E.2d 172, 174 (1988); Johnson v. Kellam,
162 Va. 757, 764-65, 175 S.E. 634, 636-37 (1934); Baltimore
& Ohio R.R. Co. v. Wightman's Adm'r, 70 Va. (29 Gratt.)
431, 446 (1877), rev'd on other grounds sub nom. Railroad
Co. v. Koontz, 104 U.S. 5 (1881).  The meaning of the
collateral source rule and its rationale are found in the
following passages from several of our prior cases:

> The law seems quite well settled that damages,
> recoverable for personal injuries inflicted through
> the negligence of another are not to be reduced by
> reason of the fact that the injured party had been
> partly compensated for his loss by insurance which he
> has procured and for which he has paid.  The reason
> for this rule is that the defendant, who by his
> negligence, has injured another, owes to such other
> compensation for the injuries he has inflicted and the
> payment for those injuries from a collateral source
> cannot relieve the defendant of his obligation.

Kellam, 162 Va. at 764, 175 S.E. at 636.  Accord Burks v.
Webb, Adm'x, 199 Va. 296, 304, 99 S.E.2d 629, 636 (1957).
Pursuant to the rule, "compensation or indemnity received
by a tort victim from a source collateral to the tortfeasor
may not be applied as a credit against the quantum of
damages the tortfeasor owes."  Schickling, 235 Va. at 474,

---

[7] The rule also applies to actions ex contractu in some jurisdictions, see Hall v. Miller, 465 A.2d 222, 226-27 (Vt. 1983) (collecting authorities).  This Court has never considered that question, Schickling v. Aspinall, 235 Va. 472, 475, 369 S.E.2d 172, 174 (1988), and need not do so today.

12

369 S.E.2d at 174.  A person who is negligent and injures another "owes to the latter full compensation for the injury inflicted[,] . . . and payment for such injury from a collateral source in no way relieves the wrongdoer of [the] obligation."  Walthew v. Davis, Adm'r, 201 Va. 557, 563, 111 S.E.2d 784, 788 (1960) (citing Webb, 199 Va. at 304, 99 S.E.2d at 636).

With regard to the issue concerning the medical expenses that were written off, Acuar first points out that the purpose of compensatory damages is to make a plaintiff whole.  See F.B.C. Stores, Inc. v. Duncan, 214 Va. 246, 251, 198 S.E.2d 595, 599 (1973).  Relying on Sykes v. Brown, 156 Va. 881, 159 S.E. 202 (1931), Acuar argues that a plaintiff may recover medical expenses only when the plaintiff "is liable for the debt incurred."  Id. at 887, 159 S.E. at 204.  Continuing, she asserts that, based on this Court's decision in State Farm Mut. Auto. Ins. Co. v. Bowers, 255 Va. 581, 500 S.E.2d 212 (1998), the portions of medical bills that are written off by health care providers are not "incurred" expenses because a plaintiff is never legally obligated to pay those amounts.  Thus, Acuar contends that the collateral source rule is not applicable to the present case because Letourneau is not, and never will be, legally obligated to pay those portions of his

13

medical bills that were written off, nor were those amounts paid on his behalf. According to Acuar, the amounts written off by health care providers are not benefits derived from a collateral source, and to allow Letourneau to recover such amounts as damages in this tort action would create a double recovery or windfall in his favor.

In opposition, Letourneau asserts that the collateral source rule does apply and that therefore Acuar cannot reduce the amount of damages for which she is liable by deducting the amounts written off by Letourneau's health care providers. Letourneau points out that his health care providers wrote off certain portions of the medical expenses because of agreements between them and his health insurance carrier, and that such agreements are part of the benefits that Letourneau obtained in exchange for the consideration, or premium, that he paid for his health insurance coverage. Letourneau maintains that, if Acuar's position were adopted, she would derive a benefit from Letourneau's health insurance without having paid any consideration for such a benefit, thereby creating a windfall for Acuar. However, based on this Court's decision in Schickling, Letourneau asserts that the law favors a windfall for the tort victim rather than the wrongdoer.

14

In deciding this issue, we first note that our decision in Bowers is not dispositive. That case involved a contractual dispute between an insured and his automobile liability insurance carrier regarding coverage under the medical payments provision of the policy at issue. Bowers, 255 Va. at 583-84, 500 S.E.2d at 212-13. Under the terms of that provision, the insurance carrier agreed to pay "on behalf of each injured person, medical expense benefits as a result of bodily injury caused by accident." Id. at 583, 500 S.E.2d at 212. The policy defined medical expense as "all reasonable and necessary expenses for medical . . . services . . . incurred . . . ." Id. Accordingly, to answer the coverage question, we focused on the meaning of the term "incurred," as defined by this Court in Virginia Farm Bureau Mut. Ins. Co. v. Hodges, 238 Va. 692, 385 S.E.2d 612 (1989). In Hodges, we said that "[a]n expense can only be 'incurred' . . . when one has paid it or become legally obligated to pay it." Id. at 696, 285 S.E.2d at 614. Thus, we concluded in Bowers that "the medical expenses Bowers [had] 'incurred' were the amounts that the health-care providers accepted as full payment for their services rendered to him" and did not include the amounts

15

written off by such providers.[8]  Bowers, 255 Va. at 585-86,
500 S.E.2d at 214.

Even though that case, like the present one, involved
medical expenses that health care providers had written
off, we were construing the specific terms of an insurance
contract in Bowers.  Thus, neither the tort policy of this
Commonwealth nor the collateral source rule was implicated.
By contrast, in the instant case, we are reviewing a tort
claim, not a contractual one, by an injured party against a
wrongdoer.

We also point out that Hodges likewise involved the
interpretation of a medical payments provision.  Hodges,
238 Va. at 693, 385 S.E.2d at 612.  In that case, the
plaintiff sought to recover the cost of surgery under the
medical payments provision of her automobile insurance
policy even though she had not yet undergone the surgery
and had not entered into a contract with the doctor to
perform the surgery on some future date.  Id. at 694-95,
385 S.E.2d at 613.  This Court concluded that the plaintiff
had not "incurred" that surgical expense within one year

---

[8] We also note that when the General Assembly defined
the term "incurred" in Code § 38.2-2201(A)(3), it did so
only in the context of provisions for payment of medical
expenses in automobile liability insurance policies.

16

from the date of the accident as required by the terms of the insurance policy.  Id. at 696, 385 S.E.2d at 614.

By way of contrast, if the plaintiff in Hodges had brought a tort action against the negligent driver who caused her injuries, such as the present case filed by Letourneau, she undoubtedly would have been allowed to recover the cost of future medical expenses as an element of damages.  See Hailes v. Gonzales, 207 Va. 612, 614, 151 S.E.2d 388, 390 (1966) (award for future medical expenses is appropriate when evidence supports such an award).  The question whether such future expenses had been "incurred" would not have been an issue.

Likewise, this Court's decision in Sykes does not provide controlling precedent for purposes of the issue before us.  There, the plaintiff sought damages for personal injuries sustained when she was struck by an automobile.  Testimony from a doctor associated with the hospital where the plaintiff had received treatment established the approximate amount of her hospital bill and the balance due on the bill.  Sykes, 156 Va. at 886, 159 S.E. at 204.  One of the errors assigned was the trial court's refusal to instruct the jury that it could not consider "any expenses incurred for hospital care, nursing,

17

medical or surgical treatment."[9]  Id. at 886-87, 159 S.E. at

204.  In support of the instruction, the defendant argued

that the evidence failed to show that the plaintiff had

paid any part of her medical expenses.  Id. at 887, 159

S.E. at 204.  In holding that the instruction was properly

refused because the record established that the plaintiff

owed another doctor for services rendered as a result of

the accident, this Court stated that "[p]ayment of the

expense of treatment is not essential to a recovery.  If

plaintiff is liable for the debt incurred, that is all that

is necessary."  Id.

The decision in Sykes focused on whether it was

necessary for the plaintiff to have paid her medical

expenses before she could claim them as part of her

damages.  The application of the collateral source rule was

not at issue.  Thus, we are not persuaded by Acuar's

argument, based on the previously quoted language from

Sykes and the definition of the term "incurred" used in

Bowers, that the collateral source rule does not apply to

---

[9] Because the doctor who testified could not state the
correct amount due the hospital but only approximated the
expenses incurred, and also could not state whether the
bill had been paid by the plaintiff or whether she was
primarily liable for the bill, the defendant also assigned
error to the trial court's failure to sustain an objection
to the doctor's testimony.  This Court concluded that the

18

the present case because Letourneau did not "incur" the medical expenses that his health care providers wrote off. That argument overlooks the fundamental purpose of the rule, explained above, to prevent a tortfeasor from deriving any benefit from compensation or indemnity that an injured party has received from a collateral source. In other words, the focal point of the collateral source rule is not whether an injured party has "incurred" certain medical expenses. Rather, it is whether a tort victim has received benefits from a collateral source that cannot be used to reduce the amount of damages owed by a tortfeasor.

Letourneau is entitled to seek full compensation from Acuar. See Walthew, 201 Va. at 563, 111 S.E.2d at 788. Based on the cases cited above dealing with the collateral source rule, we conclude that Acuar cannot deduct from that full compensation any part of the benefits Letourneau received from his contractual arrangement with his health insurance carrier, whether those benefits took the form of medical expense payments or amounts written off because of agreements between his health insurance carrier and his health care providers. Those amounts written off are as much of a benefit for which Letourneau paid consideration

---

testimony should have been excluded. Sykes, 156 Va. at 886, 159 S.E. at 204.

19

as are the actual cash payments made by his health insurance carrier to the health care providers. The portions of medical expenses that health care providers write off constitute "compensation or indemnity received by a tort victim from a source collateral to the tortfeasor . . . ." Schickling, 235 Va. at 474, 369 S.E.2d at 174.

This conclusion is consistent with the purpose of compensatory damages, which is to make a tort victim whole. However, the injured party should be made whole by the tortfeasor, not by a combination of compensation from the tortfeasor and collateral sources. The wrongdoer cannot reap the benefit of a contract for which the wrongdoer paid no compensation. Baltimore & Ohio R.R. Co., 70 Va. (29 Gratt.) at 446. The extent of Acuar's liability to Letourneau cannot be "measured by deducting financial benefits received by [Letourneau] from collateral sources." Owen v. Dixon, 162 Va. 601, 608, 175 S.E. 41, 43 (1934). In other words, "it is the tortfeasor's responsibility to compensate for all harm that he [or she] causes, not confined to the net loss that the injured party receives." Restatement (Second) of Torts § 920A cmt. b (1977).

To the extent that such a result provides a windfall to the injured party, we have previously recognized that consequence and concluded that the victim of the wrong

20

rather than the wrongdoer should receive the windfall.

Schickling, 235 Va. at 475, 369 S.E.2d at 174. We explain the rationale for that result by repeating the following explanation of the collateral source rule:

> The collateral source rule is designed to strike a balance between two competing principles of tort law:  (1) a plaintiff is entitled to compensation sufficient to make him whole, but no more; and (2) a defendant is liable for all damages that proximately result from his wrong.  A plaintiff who receives a double recovery for a single tort enjoys a windfall; a defendant who escapes, in whole or in part, liability for his wrong enjoys a windfall.  Because the law must sanction one windfall and deny the other, it favors the victim of the wrong rather than the wrongdoer.

Id. at 474-75, 369 S.E.2d at 174.

For these reasons, we hold that Letourneau may present evidence at the new trial of the full amount of his reasonable medical expenses without any reduction for the amounts written off by his health care providers.

Reversed and remanded.